# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **SHANNON HURLEY,** | ) | |
| Plaintiff | ) | Civil Action No. 1:20cv00053 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

*I. Background and Standard of Review*

Plaintiff, Shannon Hurley, ("Hurley"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966).  "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hurley protectively filed his applications for DIB[2] and SSI on October 16, 2014, alleging disability as of March 7, 2014, due to a head, neck and back injury; bilateral knee problems; a left shoulder injury; and black lung. (R. at 13, 285, 471-72, 475-81, 509.) The claims were denied initially and upon reconsideration. (R. at 308-11, 315-16, 320-22, 327-29.) Hurley then requested a hearing before an administrative law judge, ("ALJ"). (R. at 334-37.) The ALJ held a hearing on April 21, 2017, at which Hurley was represented by counsel. (R. at 166-91.)

By decision dated June 21, 2017, the ALJ denied Hurley's claims. (R. at 285-97.) After the ALJ issued his decision, Hurley pursued his administrative appeals. (R. at 411.) By order dated December 17, 2018, the Appeals Council remanded Hurley's claims and instructed the ALJ to give further consideration to the severity of Hurley's impairments at step two of the evaluation process; to give further consideration to Hurley's maximum residual functional capacity during the entire period at issue; to provide rationale with specific references to the evidence of record in support of the assessed limitations; to evaluate the medical source opinions pursuant to 20 C.F.R. §§ 404.1527, 416.927; and to explain the weight

---

[2] Hurley initially filed an application for DIB on June 7, 2004, alleging disability beginning May 5, 2003. (R. at 213.) In an undated decision, the ALJ denied Hurley's claim. (R. at 213-19.)

given to such opinion evidence. (R. at 305-06.) Upon remand, the ALJ held a supplemental hearing on October 16, 2019, at which Hurley was again represented by counsel. (R. at 193-210.)

By decision dated November 14, 2019, the ALJ denied Hurley's claims. (R. at 13-23.) The ALJ found Hurley met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2019. (R. at 15.) The ALJ found Hurley had not engaged in substantial gainful activity since March 7, 2014, the alleged onset date. (R. at 15.) The ALJ determined Hurley had severe impairments, namely degenerative disc disease of the cervical and lumbar spine and degenerative joint disease of the left knee and left shoulder, but she found Hurley did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ found Hurley had the residual functional capacity to perform light[3] work, except he could stand and walk four hours in an eight-hour workday and sit six hours in an eight-hour workday; he could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; he could occasionally reach overhead and frequently reach in all other directions with the left upper extremity; he could not climb ladders, ropes or scaffolds; he should avoid more than occasional exposure to extreme cold and vibration; and he could never work at unprotected heights or around moving machinery. (R. at 17.) The ALJ found Hurley was unable to perform his past relevant work. (R. at 21.) Based on Hurley's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Hurley could perform, including the jobs of a

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2020).

routing clerk, a price marker and an inspector. (R. at 22-23.) Thus, the ALJ concluded that Hurley was not under a disability as defined by the Act from March 7, 2014, through the date of the decision, and he was not eligible for SSI and DIB benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

After the ALJ issued her decision, Hurley pursued his administrative appeals, (R. at 43, 469-70), but the Appeals Council denied his request for review. (R. at 1-6.) Hurley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Hurley's motion for summary judgment filed April 15, 2021, and the Commissioner's motion for summary judgment filed May 14, 2021.

## II. Facts

Hurley was born in 1974, (R. at 471, 475), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Hurley has a high school education and past work experience as a roof bolter and a shuttle car operator. (R. at 197, 207, 510.) Hurley testified he suffered from chronic neck, lower back and shoulder pain. (R. at 198.) He stated his neck pain radiated into his right shoulder. (R. at 198.) Hurley stated he used inhalers daily. (R. at 200.) He stated he was able to take care of his personal needs without assistance and perform light housework, such as vacuuming, loading the dishwasher and laundry. (R. at 204.)

Anthony Michael, Jr., a vocational expert, was present and testified at Hurley's October 16, 2019, hearing. (R. at 206-09.) Michael was asked to consider

a hypothetical individual of Hurley's age, education and work history, who had the residual functional capacity to perform light work that did not require him to stand and walk more than four hours in a workday; that required no more than occasional climbing of ramps and stairs, stooping, kneeling, crouching and crawling; that allowed occasional reaching overhead and frequent reaching in all other directions with the left upper extremity; that did not require climbing ladders, ropes or scaffolds; that did not require more than occasional exposure to extreme cold and vibration; and that did not require him to work around unprotected heights or moving machinery. (R. at 207-08.) He stated that such an individual could not perform Hurley's past work, but other work existed in significant numbers that such an individual could perform, including jobs as a routing clerk, a price marker and an inspector. (R. at 208-09.) When asked to consider the same hypothetical individual, but who would be limited to only occasional reaching, handling and fingering with the bilateral upper extremities, Michael stated such an individual would not be able to perform any work. (R. at 209.)

In rendering her decision, the ALJ reviewed records from Dr. Rachel Petit, S.D.M., a state agency consultant; Dr. Alex Guerrero, M.D., a state agency physician; United Medical Group; Pain Management Clinic; Kentucky Pain Physicians, PSC; Pikeville Methodist Hospital; Holistic Medical, LLC; Pikeville Medical Center; TLC Family Practice, LLC; Appalachian Regional Healthcare, Inc.; Buchanan General Hospital; Dynamic Physical Therapy Associates; and Dr. David E. Muffly, M.D., an orthopedic surgeon. Hurley's attorney also submitted medical records from Pikeville Medical Center and Tug Valley ARH Regional Medical Center to the Appeals Council.[4]

---

[4] Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence

In May 2003, Hurley injured his neck, back and left shoulder in a mining accident. (R. at 57, 589.) X-rays of Hurley's cervical, thoracic and lumbar spine were normal. (R. at 589, 592-93.) He was diagnosed with musculoskeletal pain. (R. at 589.) In February 2004, an MRI of Hurley's lumbar spine showed a small cyst in the inferior aspect of the L4 vertebral body. (R. at 609.)

In May 2007, an MRI of Hurley's left shoulder showed degenerative changes and some irregularity near the rotator cuff insertion site without a tear. (R. at 613.) In July 2007, Hurley was seen at the Pain Management Center for neck pain. (R. at 616-17.) Hurley reported ongoing discomfort in his neck and bilateral shoulder areas. (R. at 616.) He was diagnosed with cervical spondylosis without myelopathy and left suprascapular and paracervical myofascial pain syndrome. (R. at 617.)

In May 2009, Hurley was hospitalized for cellulitis of the left knee. (R. at 657-59.) X-rays of Hurley's left knee showed considerable soft tissue swelling anteriorly with no acute osseous abnormality. (R. at 660.) An MRI of Hurley's left knee showed a tear involving the posterior horn of the medial meniscus; prepatellar subcutaneous hematoma; and minimal joint effusion. (R. at 661.)

Hurley was seen at Kentucky Pain Physicians, PSC, throughout 2013 for complaints of neck, low back, left shoulder and left knee pain. In March 2013, x-rays of Hurley's left knee showed no evidence of bone or soft tissue abnormality. (R. at 656.) Chest x-rays were normal. (R. at 667.) In August 2013, Hurley complained of neck pain with associated burning sensation into the right shoulder.

---

supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

(R. at 755.) He also complained of low back pain, left shoulder pain and left knee pain. (R. at 755.) On September 26, 2013, an MRI of Hurley's left knee showed an extensive horizontal meniscal tear involving the posterior horn of the medial meniscus and a small joint effusion with no acute fracture. (R. at 768.)

In October and November 2013, Hurley had paraspinal muscle spasm and mildly reduced paraspinal muscle tone in the lumbosacral spine; his straight leg raising test was positive bilaterally; he had normal range of motion in his bilateral upper and lower extremities; his motor examination showed normal strength, tone and muscle bulk; he had 2+ reflexes in the bilateral upper and lower extremities; his sensation was intact; his gait was normal; and he was able to stand without difficulty. (R. at 757-58, 764-65.) On December 3, 2013, Hurley denied shortness of breath. (R. at 773.) Hurley had paraspinal muscle spasm and mildly reduced paraspinal muscle tone in the cervical and lumbosacral spine; and his left upper extremity had normal joint stability, restricted range of motion and shoulder crepitus. (R. at 774.) On December 16, 2013, x-rays of Hurley's chest showed possible pneumoconiosis. (R. at 669.)

In January, February and April 2014, Hurley had mild paraspinal muscle spasm of the cervical spine and moderate paraspinal muscle spasm of the thoracic spine; he had restricted range of motion of the left upper extremity; his straight leg raising tests were positive bilaterally; his motor examination was normal, except for weakness and decreased tone in the left lower extremity; and, while his gait was normal in January, by April, it was noted he ambulated with a limp. (R. at 779, 786, 796-97.)

On May 21, 2014, electrodiagnostic testing showed abnormalities at the L3 level bilaterally, but no hyperesthetic findings were noted. (R. at 800-01.) On June 20, 2014, Hurley had moderate tenderness and paraspinal muscle spasm in the lower cervical region; he had tenderness in the thoracic spine; he had mild tenderness and mildly reduced range of motion of the lumbosacral spine with paraspinal weakness; his left upper extremity had restricted range of motion; he had moderate tenderness to palpation in the right lower extremity, decreased stability and pain in the knee with movement; he had mild tenderness to palpation in the left lower extremity with normal range of motion; his motor examination was normal, except for weakness and decreased tone in the left lower extremity; and he ambulated with a limp. (R. at 811-12.) On July 3, 2014, x-rays of Hurley's cervical spine were negative, and x-rays of his left shoulder were normal. (R. at 814-15.) On July 21, 2014, Hurley reported that participating in physical therapy made his neck pain worse. (R. at 816.) His examination findings remained unchanged. (R. at 818-19.)

On August 21, 2014, Dr. David E. Muffly, M.D., an orthopedic surgeon, examined Hurley at the request of Hurley's attorney. (R. at 826-29.) Hurley complained of cervical pain with burning sensation into his neck and lumbar spine, left shoulder and left knee pain. (R. at 826.) He reported medication provided "some relief." (R. at 826.) Hurley's right hand grip strength was 68 pounds, and his left hand grip strength was 53 pounds; he walked without a limp; he had good balance; he could squat, but complained of left knee and low back pain; he had normal strength and sensation in both arms; his left shoulder had full range of motion, mild acromioclavicular, ("AC"), joint tenderness and normal rotator cuff muscle strength; his right shoulder had full range of motion, as well as the fingers, wrists and elbows; he had normal strength and sensation in his legs; his left knee

had tenderness on the medial joint line and full range of motion; the right knee had full range of motion; his cervical spine had tenderness in the right side and limited range of motion; and his lumbar spine had tenderness. (R. at 827-28.) Dr. Muffly diagnosed chronic cervical and lumbar strain; chronic cervical pain; chronic low back pain; and left knee medial meniscus tear. (R. at 828.) Dr. Muffly assessed Hurley's cervical and lumbar spine impairment each at six percent and his left knee impairment at one percent with a whole person impairment rating of 13 percent. (R. at 829.) Dr. Muffly permanently restricted Hurley from lifting items weighing greater than 30 pounds and no crawling, bending or stooping. (R. at 829.)

That same day, Dr. Muffly completed a medical assessment, indicating that Hurley could occasionally lift and carry items weighing up to 30 pounds; sit up to six hours in an eight-hour workday and could do so for up to one hour without interruption; stand and/or walk a total of four hours in an eight-hour workday and could do so for up to one hour without interruption; occasionally reach, handle, finger and feel with both hands; push and pull within the restricted weight limit with both hands; occasionally operate foot controls with both feet; never climb ladders or scaffolds, kneel, crouch or crawl; occasionally climb stairs and ramps, balance and stoop; never work around unprotected heights; and occasionally work around moving mechanical parts and vibrations. (R. at 830-35.) He opined that these limitations were first present in March 2014 and would be expected to last for 12 consecutive months. (R. at 835.)

On September 10, 2014, x-rays of Hurley's chest showed the C7-T1 disc space to be obscured and could not be evaluated, but the remainder of the cervical spine was intact. (R. at 841.) On September 24, 2014, x-rays of Hurley's right knee

were negative. (R. at 838.) X-rays of Hurley's left shoulder showed slight elevation of the clavicle at the acromion with minimal widening of the AC joint. (R. at 839.)

In September and October 2014, Hurley reported numbness and tingling in both feet. (R. at 855, 860.) He reported his pain medication was "partially effective." (R. at 855, 860.) Hurley had moderate right-sided tenderness and paraspinal muscle spasm in the cervical region; he had mild tenderness in the thoracic spine; he had mild tenderness, paraspinal muscle weakness and mildly reduced range of motion in the lumbosacral spine; he had mild tenderness to palpation and restricted range of motion in the left upper extremity; his right lower extremity had mild tenderness to palpation, decreased stability and knee pain with movement; his left lower extremity had mild tenderness to palpation and normal range of motion; his motor examination was normal, except for weakness and decreased tone in the left lower extremity; and he ambulated with a limp. (R. at 857-58, 863.)

On November 13, 2014, Mark Martin, N.P., a nurse practitioner with Kentucky Pain Physicians, reported Hurley had moderate right-sided tenderness and paraspinal muscle spasm in the cervical region; he had mild tenderness, paraspinal muscle weakness and mildly reduced range of motion in the lumbosacral spine; he had mild tenderness to palpation and mildly restricted range of motion in the left upper extremity; his right lower extremity had mild tenderness to palpation and knee pain; his left lower extremity had mild tenderness to palpation and normal range of motion; his motor examination showed normal strength, tone and muscle bulk in the bilateral upper and lower extremities; and he had an antalgic gait with no difficulty standing. (R. at 852-53.)

On January 24, 2015, Dr. Rachel Petit, S.D.M., a state agency consultant, opined Hurley had the residual functional capacity to perform light work, except he was limited to standing and/or walking a total of four hours in an eight-hour workday. (R. at 230-33.) She found Hurley had an unlimited ability to balance; he could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and he could never climb ladders, ropes or scaffolds. (R. at 230-31.) Dr. Petit found Hurley could occasionally reach overhead bilaterally. (R. at 231.) She opined Hurley should avoid moderate exposure to vibration and avoid all exposure to hazards, such as machinery and heights. (R. at 232.)

On May 7, 2015, x-rays of Hurley's chest were normal. (R. at 100.) That same day, a pulmonary function test showed minimal obstructive airway disease. (R. at 102.) On May 8, 2015, an MRI of Hurley's cervical spine showed a small disc bulge at the C4-C5 disc space without significant canal or foraminal narrowing. (R. at 87.)

On June 5, 2015, Dr. Alex Guerrero, M.D., a state agency physician, opined Hurley had the residual functional capacity to perform light work, except he was limited to standing and/or walking a total of four hours in an eight-hour workday. (R. at 260-63.) He found Hurley had an unlimited ability to balance; he could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and he could never climb ladders, ropes or scaffolds. (R. at 261.) Dr. Guerrero found Hurley could occasionally reach overhead bilaterally. (R. at 261.) He opined Hurley should avoid concentrated exposure to extreme cold; avoid moderate exposure to vibration; and avoid all exposure to hazards, such as machinery and heights. (R. at 262.)

On August 24, 2015, Betty Karnes, N.P., a nurse practitioner with Karnes Medical Services, LLC, saw Hurley for complaints of neck, shoulder and left leg pain. (R. at 888-90.) Upon examination, Hurley had no wheezing, crackles or rales; he had degenerative disc disease and cervical spondylosis; he had a normal gait and balance; his motor examination was normal; his deep tendon reflexes were equal and symmetrical; and he had intact sensation. (R. at 889.) Karnes diagnosed cervical spondylosis; neck pain; muscle spasm; shoulder pain; degeneration of intervertebral disc; and insomnia. (R. at 889.) Karnes continued to treat Hurley approximately monthly throughout 2015. (R. at 891-99.) She instructed Hurley to limit bending; to not drive, sit or stand in one place for more than 30 minutes without interruption; to not lift items weighing greater than 20 pounds; and to not reach or do overhead work. (R. at 890.) Karnes instructed Hurley to change positions frequently to avoid stiffness, to take rest periods and to eliminate additional stressors. (R. at 896, 899.)

On January 19, 2016, Hurley complained of left shoulder and right knee pain. (R. at 900.) Hurley had minimal obstructive lung disease; a disc bulge at the C4-C5 disc space and muscle spasms; his extremities had paresthesia and neuropathy; his gait and balance were normal; his motor examination was normal; his deep tendon reflexes were equal and symmetrical; and he had intact sensation. (R. at 901.) Karnes instructed Hurley to change positions frequently to avoid stiffness, to take rest periods and to eliminate additional stressors. (R. at 902.) On February 24, 2016, Karnes's examination findings remained the same. (R. at 904.)

On March 10, 2016, Dr. Naveed Ahmed, M.D., saw Hurley for complaints of bilateral arm and leg numbness and back and neck pain. (R. at 994-1002.) Dr. Ahmed reported Hurley's pulmonary examination was normal; his cervical and

-12-

lumbar spine had tenderness and moderately reduced range of motion; his motor strength was 4/5 in all extremities; his deep tendon reflexes were symmetrically decreased; he had normal balance, gait and coordination; and his fine motor skills were normal. (R. at 1000.) He diagnosed bilateral carpal tunnel syndrome; intervertebral disc degeneration and displacement of the lumbar region; cervical disc degeneration and displacement; and cervical and lumbar radiculopathy. (R. at 995, 1000-01.) On April 13, 2016, a nerve conduction study and electromyography, ("EMG"), showed mild left ulnar neuropathy. (R. at 989, 1122.)

On May 19, 2016, Hurley saw Dr. Ahmed for complaints of numbness, back and neck pain and headaches. (R. at 1015.) Dr. Ahmed reported Hurley's pulmonary examination was normal; his cervical and lumbar spine had tenderness and moderately reduced range of motion; his motor strength was 4/5 in all extremities; his deep tendon reflexes were symmetrically decreased; he had normal balance, gait and coordination; and his fine motor skills were normal. (R. at 1018-19.) Dr. Ahmed added chronic migraine without aura to his diagnoses. (R. at 1019.)

That same day, Hurley complained of numbness in both feet and left arm and shoulder pain. (R. at 976.) Karnes reported Hurley had bilateral carpal tunnel, paresthesia and neuropathy; he had a normal gait and balance; his motor examination was normal; his deep tendon reflexes were equal and symmetrical; and he had intact sensation. (R. at 977.) On June 20, 2016, a nerve conduction study and EMG of Hurley's bilateral lower extremities were normal. (R. at 1043, 1121, 1180.) On June 28, 2016, Hurley complained of neck and low back pain and stated he had difficulty with his activities of daily living, including assuming a standing position, prolonged sitting, riding in a car, strenuous activity and

yardwork. (R. at 1136.) In June and July 2016, Hurley reported he was "doing okay," and his medications were helping. (R. at 965, 973.) Karnes's examination findings remained unchanged. (R. at 966, 974.) On August 22, 2016, Hurley complained of pain in his back, shoulders and knees. (R. at 959.) Karnes's examination remained unchanged. (R. at 960.) As to Hurley's low back pain, Karnes instructed him to limit bending; to not drive, sit or stand in one place for more than 30 minutes without interruption; to not lift items weighing greater than 20 pounds; and to not reach or do overhead work. (R. at 961.)

On September 21, 2016, a pre-exercise arterial blood gas study showed moderate acute respiratory alkalosis, and his oxygen level was normal. (R. at 933.) Hurley's post-exercise arterial blood gas study showed mild metabolic acidosis and a normal oxygen level. (R. at 934.) That same day, chest x-rays showed pneumoconiosis. (R. at 80, 943.) On October 20, 2016, a pulmonary function test showed minimal airway obstruction. (R. at 77-78.)

On November 4, 2016, Dr. Jason Fogg, D.O., a physician with Pikeville Medical Center, reported Hurley's pulmonary examination was normal; his cervical, thoracic and lumbar spine had spasm and moderate pain with range of motion; he had "maximum" tenderness in the trapezius area; he had normal strength in all extremities; his deep tendon reflexes were symmetric; he had an antalgic, but steady, gait; and his coordination was normal. (R. at 1063.) Dr. Fogg added myalgia and cervicalgia to his diagnoses. (R. at 1064.) On November 16, 2016, Hurley complained of numbness and tingling in his left shoulder and right foot and bilateral foot pain. (R. at 948.) Karnes's examination findings remained unchanged. (R. at 949.) On November 30, 2016, Hurley complained of left elbow pain with numbness and tingling that radiated from his forearm into his hand. (R.

at 1076, 1084.) He reported neck injections provided some relief. (R. at 1084.) Hurley's left elbow showed cubital tunnel, laxity; he had active range of motion of both elbows; neurovascular findings in the upper extremities were normal except for left elbow ulnar nerve sensory distribution; and his upper extremity strength was normal except for left intrinsic and left grip strength of 4/5. (R. at 1079.) He was diagnosed with cervical radiculopathy and mild cubital tunnel syndrome. (R. at 1079.) Conservative treatment with activity modification was advised since Hurley would not likely benefit from ulnar nerve decompression. (R. at 1079.) On December 14, 2016, Hurley complained of numbness and tingling in his left shoulder and right foot. (R. at 944.) Karnes's examination findings remained unchanged. (R. at 945.) That same day, a cervical trigger point injection was administered. (R. at 1192-96.) As to Hurley's osteoarthrosis, Karnes instructed him to change positions frequently to avoid stiffness, take rest periods and eliminate additional stressors. (R. at 946, 950, 954, 958, 967, 975, 978.)

On February 1, 2017, an MRI of Hurley's left shoulder showed a partial tear of the rotator cuff tendon; hypertrophy of the acromioclavicular, ("AC"), joint; and mild impingement changes. (R. at 75.) In February and March 2017, MRIs of Hurley's cervical spine showed degenerative disc disease with a small posterior central herniation at the C5-C6 disc level, resulting in mild central stenosis. (R. at 1271, 1306.) Hurley was diagnosed with cervical radiculopathy and partial rotator cuff tear of the left shoulder.[5] (R. at 1275.) On March 9, 2017, Hurley had a left shoulder joint injection. (R. at 1289.) He reported he was "doing ok," and his medications were helping. (R. at 1330.) On April 19, 2017, x-rays of Hurley's knees showed no evidence of acute fracture or dislocation and preserved joint

---

[5] On March 28, 2017, Hurley was evaluated for physical therapy treatment at Appalachian Regional Healthcare for his left shoulder rotator cuff tear. (R. at 57-64.)

spaces. (R. at 45.) In May and June 2017, Hurley complained of back pain, left shoulder pain, bilateral knee pain, neck pain and shortness of breath. (R. at 1318, 1322.) As to Hurley's osteoarthrosis, Karnes instructed Hurley to change positions frequently to avoid stiffness, to take rest periods and to eliminate additional stressors. (R. at 1320, 1324, 1328, 1332, 1336.) As to Hurley's low back pain, Karnes instructed him to limit bending; to not drive, sit or stand in one place for more than 30 minutes without interruption; to not lift items weighing greater than 20 pounds; and to not reach or do overhead work. (R. at 1320, 1324, 1328, 1332, 1336.)

On December 1, 2017, Hurley established care at United Medical Group. (R. at 131-37.) Upon examination, Hurley's lungs were clear with no rales, rhonchi or wheezes; his back had an abnormal curvature, paraspinal muscle and neck tenderness; and his extremities had full range of motion with no deformities, edema or erythema. (R. at 136.) Hurley was diagnosed with lumbago; hypertriglyceridemia; gastroesophageal reflux disease, ("GERD"); migraines; and muscle pain. (R. at 136.)

In January 2018, MRIs of Hurley's lumbar spine showed a mild annular bulge with degenerative change of the facet joints resulting in mild left-sided foraminal stenosis at the L4-L5 level and an annular bulge with degenerative change of the facet joints resulting in mild left-sided foraminal stenosis at the L5-S1 level. (R. at 1440, 1465.)

On February 2, 2018, Hurley underwent physical therapy for complaints of left anterior shoulder pain and medial-superior scapular pain. (R. at 48-56.) He reported his last steroid injection did not offer any relief. (R. at 48.) Hurley was

limited in his ability to reach behind his back, to raise his arm overhead, to reach behind his head and to carry items weighing 10 pounds with his left upper extremity. (R. at 49.) Hurley was discharged for failing to return for treatment. (R. at 49.) In November and December 2018, Hurley underwent a lumbar epidurogram. (R. at 1379-80.)

On January 14, 2019, Hurley's lungs were clear with no rales, rhonchi or wheezes; his back had abnormal curvature; he had paraspinal muscle tenderness and spasm with decreased range of motion of the cervical and lumbar spine; and he had decreased sensation of the bilateral lower extremities. (R. at 1603.) On January 23, 2019, an MRI of Hurley's cervical spine showed a small focal central disc herniation at the C5-C6 disc space. (R. at 1513-14.) On February 4, 2019, Hurley was referred to pain management for neck pain. (R. at 129.) On February 27, 2019, Hurley complained of neck pain that radiated into his right shoulder. (R. at 1559.) He stated relieving factors included injections and rest. (R. at 1559.) Hurley's respiratory examination was normal; he had muscle spasm in the cervical spine and moderate pain with range of motion; and he had right-sided neck paraspinal and trapezius pain that radiated into the scapular region. (R. at 1562.) Hurley received a trigger point injection at the right trapezius and cervical paraspinal muscles. (R. at 1564.)

On February 28, 2019, Dr. Abdallah Kharnaf, M.D., a physician with Pikeville Medical Center, saw Hurley for a lung nodule. (R. at 1569.) That same day, a CT scan of Hurley's chest showed pulmonary nodularity throughout both lungs measuring up to approximately 3 mm. (R. at 1568.) Hurley had decreased breath sounds, bilaterally. (R. at 1573.) Hurley was prescribed two inhalers, which he used daily. (R. at 1569.) He was diagnosed with a pulmonary nodule; COPD;

coal worker's pneumoconiosis; and GERD without esophagitis. (R. at 1573.) On March 20, 2019, a chest x-ray showed scattered pulmonary nodularity throughout both lungs and mildly enlarged and borderline sized lymph nodes. (R. at 105-06, 1550-51.)

On April 8, 2019, Hurley complained of low back pain, neck pain that radiated into both shoulders and migraine headaches. (R. at 1524.) Hurley's lungs were clear with no rales, rhonchi or wheezes; his back had an abnormal curvature and paraspinal muscle tenderness; he had cervical muscle tenderness with decreased range of motion in the cervical and lumbar spine with spasm; and his bilateral lower extremities had decreased sensation. (R. at 1525.) On April 18, 2019, Hurley underwent cervical trigger point injections. (R. at 1578-82.) On April 25, 2019, Hurley reported mild shortness of breath, cough and wheezing. (R. at 1583.) He had decreased breath sounds, bilaterally. (R. at 1588.)

On July 9, 2019, Hurley was seen at Pikeville Medical Center for complaints of neck pain that radiated into his bilateral upper arms. (R. at 114-19.) Upon examination, Hurley had mild right trapezius and paracervical tenderness. (R. at 117.) He was diagnosed with cervical disc displacement at the C5-C6 disc space. (R. at 117.) On October 17, 2019, Hurley reported that his pulmonary symptoms were chronic and controlled. (R. at 105-13.) He stated his symptoms were aggravated by cold and hot weather and exertion. (R. at 105.) Upon examination, Hurley had decreased breath sounds, bilaterally, and his musculoskeletal examination was normal. (R. at 110.) He was diagnosed with COPD; coal worker's pneumoconiosis; pulmonary nodule; and GERD without esophagitis. (R. at 111.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Hurley argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 13-21.) In particular, Hurley argues that the ALJ erred by failing to properly evaluate the opinions of Karnes, Dr. Muffly and the state agency

physicians. (Plaintiff's Brief at 14-18.) Hurley also argues that the ALJ failed to properly consider his impairments, including migraine headaches, ulnar neuropathy, cubital tunnel syndrome, carpal tunnel syndrome and pneumoconiosis. (Plaintiff's Brief at 18-21.)

The ALJ found Hurley had the severe impairments of degenerative disc disease of the cervical and lumbar spine and degenerative joint disease of the left knee and left shoulder. (R. at 16.) The ALJ specifically found Hurley did not suffer from a severe lung impairment. (R. at 16.)

The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1522(a), 416.922(a) (2020). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1522(b), 416.922(b) (2020). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

A December 2013 chest x-ray of Hurley showed possible pneumoconiosis. (R. at 669.) A May 2015 pulmonary function test showed minimal obstructive

airway disease. (R. at 102.) In September 2016, x-rays of Hurley's chest showed scattered reticulonodular densities, consistent with pneumoconiosis. (R. at 80, 934.) Arterial blood gas studies done the same day were somewhat abnormal. (R. at 934.) A pulmonary function test in October 2016, again, showed minimal obstructive pulmonary disease. (R. at 77-78.) Beginning in May 2017, Hurley complained of shortness of breath. (R. at 1318 1322, 1583.) A February 2019 CT scan of Hurley's chest showed lung nodules throughout both lungs. (R. at 1568.) Hurley had decreased breath sounds, bilaterally. (R. at 1573.) He was diagnosed with COPD and pneumoconiosis and prescribed two inhalers for daily use. (R. at 1569, 1573.)

While there is no medical opinion evidence contained in this record placing restrictions on Hurley's work-related abilities due to his well-documented lung impairment, it is hard to imagine that a diagnosis of pneumoconiosis would not, at the very least, affect his ability to return to his past relevant work as a underground coal miner.

The Commissioner has a duty to develop the record. *See* 20 C.F.R. §§ 404.1512(b), 416.912(b) (2020). In Hurley's case, it does not appear that any physician ever assessed his work-related abilities based on his pulmonary impairment. Dr. Muffly's assessment occurred in 2014, and there is no evidence that he was aware of Hurley's pneumoconiosis diagnosis. (R. at 830-35.) Both the state agency physicians completed their assessments in 2015, before much of the evidence of pulmonary impairment was developed. (R. at 230-33, 260-63.) The same is true of Karnes's 2015 and 2017 assessments. (R. at 890, 1320, 1324, 1328, 1332, 1336.)

While this record might be sufficient to support the ALJ's decision on this issue were Hurley's claims not being remanded as stated below, the court believes that on remand the Commissioner has a duty to develop the record as to what, if any, work-related restrictions should be placed on Hurley due to his pulmonary impairment.

The ALJ found that Hurley had the residual functional capacity to perform light work, except he could stand and walk up to four hours in an eight-hour workday and sit up to six hours in an eight-hour workday; he could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; he could occasionally reach overhead and frequently reach in all other directions with the left upper extremity; he could not climb ladders, ropes or scaffolds; he should avoid more than occasional exposure to extreme cold and vibration; and he could never work at unprotected heights or around moving machinery. (R. at 17.) In making this residual functional capacity, the ALJ stated she was giving "partial weight" to the assessment of state agency physician, Dr. Guerrero. (R. at 20.) The ALJ noted Dr. Guerrero's assessments of Hurley's exertional, postural and environmental functioning were consistent with the overall evidence of record, which documented chronic pain with moderate functional deficits on examination. (R. at 20.) She further found Dr. Guerrero's assessment that Hurley could occasionally reach overhead with the left upper extremity to be supported by Hurley's left shoulder dysfunction, but there was no evidence to support such limitations with the right shoulder. (R. at 20.)

Hurley argues the ALJ failed to mention the assessment of state agency consultant, Dr. Petit. (Plaintiff's Brief at 16-17.) While the ALJ directly references Dr. Guerrero, she failed to mention Dr. Petit's assessment. (R. at 20.) In rejecting

Dr. Guerrero's limitations, the ALJ stated there was no evidence to support the limitations concerning Hurley's right shoulder. (R. at 20.) However, both sources clearly stated this area of limitation was based on neck and cervical spine pain and reduced range of motion. (R. at 245, 261.) The record shows Hurley complained of bilateral shoulder pain in July 2007. (R. at 616.) In August 2013, he complained of neck pain that radiated a burning sensation into his right shoulder. (R. at 755.) In 2016, Hurley complained of bilateral arm and shoulder pain, and Dr. Fogg reported Hurley had "maximum tenderness" in the trapezius and paracervical regions. (R. at 959, 994, 1063.)

Again, in 2019, Hurley reported neck pain, which radiated into both shoulders. (R. at 114, 1524, 1559.) Upon examination, Hurley had right-sided neck paraspinal and trapezius pain that radiated into the scapular region. (R. at 1562.) Karnes diagnosed bilateral shoulder pain; paresthesia; neuropathy; radiculopathy of the cervical region; cubital tunnel syndrome; and bilateral carpal tunnel syndrome. (R. at 945, 949, 960, 966, 974, 977.) In addition, MRIs of Hurley's cervical spine showed a disc bulge at the C4-C5 disc space, as well as degenerative disc disease with a small posterior central herniation at the C5-C6 disc space, resulting in mild central stenosis. (R. at 87, 1271, 1513-14.) In addition, Dr. Muffly opined Hurley could only occasionally reach, bilaterally, and nurse practitioner Karnes found Hurley could not reach or do overhead work. (R. at 832, 890, 961, 1320, 1324, 1328, 1332, 1336.) Yet, the ALJ failed to mention Karnes's restrictions.

The ALJ further noted that she was giving "great weight" to Dr. Muffly's assessment regarding Hurley's ability to lift; to carry; to push; to pull; to sit; to stand; to walk; to reach overhead with the left upper extremity; to climb; to

balance; and to stoop because these portions of his assessment were consistent with the evidence of record and with his own personal examinations of Hurley. (R. at 21.) The ALJ gave the remaining portions of Dr. Muffly's opinions "little weight," stating that there was no evidence that Hurley had any limitations with his right upper extremity, either in Dr. Muffly's examination or in the treatment notes generally. (R. at 21.) The ALJ noted Hurley did not exhibit manipulative deficits to support Dr. Muffly's assessment that he could only occasionally handle, finger or feel when Dr. Muffly documented generally normal grip strength, which was documented elsewhere in the record as well. (R. at 21.) However, the ALJ did not discuss Dr. Muffly's finding that Hurley could only occasionally perform bilateral reaching. (R. at 832.) The ALJ further noted Hurley's knee pain did not cause marked deficits in range of motion or stability and did not support precluding performance of all kneeling, crouching or crawling activities or occasional operation of foot controls. (R. at 21.)

Dr. Muffly opined Hurley had the residual functional capacity to sit up to six hours in an eight-hour workday and could do so for up to one hour without interruption, and he could stand and/or walk a total of four hours in an eight-hour workday and could do so for up to one hour without interruption. (R. at 831.) While the ALJ stated she was giving "great weight" to Dr. Muffly's assessment on Hurley's ability to sit, stand and walk, she failed to mention Dr. Muffly's assessment that Hurley could do so for up to only one hour without interruption. (R. at 831.) Furthermore, Karnes restricted Hurley from sitting or standing more than 30 minutes without interruption and instructed him to "limit bending" and to change positions frequently. (R. at 890, 896, 899, 946, 950, 954, 958, 961, 967, 975, 978, 1320, 1324, 1328, 1332, 1336.) Yet, the ALJ failed to address the limitations assessed by Karnes.

The ALJ limited Hurley to a light range of work activity that allowed him to stand and/or walk four hours in an eight-hour workday and sit six hours in an eight-hour workday. (R. at 17.) The ability to perform light work requires "a good deal of walking or standing," or when it "involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). Furthermore, Social Security Ruling 83-10, indicates that the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday. *See* Social Security Ruling, ("S.S.R."), 83-10, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 1992). The ALJ's decision fails to accept or reject the findings of Dr. Muffly and Karnes concerning Hurley's ability to stand, walk and sit 30 minutes to one hour without interruption and their findings concerning Hurley's ability to perform bilateral reaching.

As noted above, the ALJ found Hurley's knee pain did not cause marked deficits in range of motion or stability and did not support precluding performance of all kneeling, crouching or crawling activities or occasional operation of foot controls. (R. at 21.) I disagree. The record shows Hurley had weakness and decreased tone in his left lower extremity; he had decreased stability and pain in his right lower extremity; he complained of numbness and tingling in both feet; he had right lower extremity tenderness and knee pain; he ambulated with a limp; his straight leg raising tests were positive; his deep tendon reflexes were symmetrically decreased; and he had decreased sensation in both lower extremities. (R. at 757, 764, 779, 786, 796-97, 811-12, 818-19, 827-28, 852-53, 855, 857-58, 860, 863, 948, 1000, 1018-19, 1525, 1603.)

It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight [s]he has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

In assessing a claimant's residual functional capacity, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis" before the residual functional capacity may be stated "in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R., 96-8p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013)). The ALJ's residual functional capacity assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in her residual functional capacity finding. *Mascio*, 780 F.3d at 636 (quoting S.S.R. 96-8p). Thus,

I do not find that substantial evidence exists to support the ALJ's finding regarding Hurley's residual functional capacity.

Based on the above, I do not find that substantial evidence exists to support the ALJ's weighing of the medical evidence or her finding as to Hurley's residual functional capacity. Thus, I do not find that substantial evidence exists to support he ALJ's finding that Hurley was not disabled. Based on these findings, I will not address Hurley's remaining argument.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence does not exist in the record to support the ALJ's weighing of the medical evidence;

2.    Substantial evidence does not exist in the record to support the ALJ's residual functional capacity finding; and

3.    Substantial evidence does not exist in the record to support the Commissioner's finding that Hurley was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hurley's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Hurley's claims to the Commissioner for further development.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

>    Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    August 3, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE